Filed 6/2/26  In re A.D. CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| In re A.D. et al., Persons Coming Under the Juvenile Court Law. | B347522 |
| | (Los Angeles County Super. Ct. Nos. 21CCJP00351, 21CCJP00351A,  ) 21CCJP00351B |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent. | |
| v. | |
| D.D., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Safaan K. Ahmed, Judge.  Affirmed.

Jesse Frederic Rodriguez, under appointment by the Court of Appeal for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, Kimberly Roura, Principal Deputy County Counsel, for Plaintiff and Respondent.

---

Father D.D. appeals from the juvenile court's order terminating his parental rights over his son A. following a hearing pursuant to Welfare and Institutions Code section 366.26.[1] He argues that the court erred by failing to apply the parental benefit exception to termination of his parental rights. We find no error and therefore affirm.

## BACKGROUND

### I. Prior Proceedings

Father and mother, C.T., are parents to A., born in 2016, and R., born in 2019. Mother also has two older daughters, with whom she failed to reunify.[2]

In 2016, the juvenile court sustained a petition filed by the Los Angeles County Department of Children and Family Services (DCFS) on behalf of A., based on mother's substance abuse, including using methamphetamines while pregnant with A. The court subsequently terminated jurisdiction with a juvenile custody order awarding joint legal custody of A. to mother and father, and sole physical custody to father.

### II. Referral and Petition

In December 2020, DCFS received a referral stating that while in a vehicle, father "backhanded" mother in the face. A. and R. were in the backseat of the vehicle at the time. Father was arrested. Mother told the police that she and father were arguing, then father hit her three or four

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

[2] Father appeals only the termination of parental rights as to A. Neither R. nor mother's other children are subjects of the appeal and mother is not a party to this appeal. Mother's older daughters lived under a legal guardianship with maternal grandmother until the grandmother's death in 2022. They were ultimately placed with a family friend as legal guardian.

times in the face with the back of his hand, causing her tooth to come out. Mother had a large hematoma on her forehead and was bleeding from her mouth.

In January 2021, DCFS filed a dependency petition on behalf of A. and R. under section 300, subdivisions (a) and (b)(1). Allegations a-1 and b-1 alleged that mother and father had a history of engaging in violent physical altercations in the presence of the children, including the December 2020 incident. The petition further alleged that on a prior occasion, father pepper sprayed mother in the children's presence.

The juvenile court removed A. and R. from both parents, placing them in foster care. The court ordered monitored visitation for both parents, twice weekly for two hours.

## III. Jurisdiction and Disposition

In the March 2021 jurisdiction/disposition report, mother told DCFS that despite the custody order giving physical custody to father, father dropped off A. with mother in March 2020. A. had lived with mother since that time.

Father had an initial visit with A. and R. on March 5, 2021. DCFS reported that father had been uncooperative. He failed to attend a scheduled meeting and would not engage with the CSW or provide any information during a visit. He also did not inquire about visiting the children. The CSW reported that there were no monitors available for visits on the days that father and the children were available, and father had not provided contact information for any other possible monitors.

DCFS filed a first amended petition, adding count b-2 regarding mother's failure to reunify with her older children, count b-3 alleging mother's substance abuse, and count b-4 alleging that father left the children with mother despite mother's substance abuse history and without making a plan for their ongoing care and supervision.

In a last-minute information on March 14, 2021, DCFS reported that father had monitored visits once a week as well as monitored phone calls with the children. DCFS approved paternal grandmother (PGM) to monitor a second weekly visit, but father rejected that offer. Father refused to

3

participate in a child and family team (CFT) meeting related to the case. He also refused to discuss the allegations with DCFS.

As of April 2021, father was visiting the children once a week for about two hours. At the end of a visit, the human services aide (HSA) monitor reported that father became combative. R. had a tantrum and father did nothing until the HSA suggested that he pick up the child. Father picked up R. several minutes later and told the children DCFS did not care about their safety.

At the April 2021 adjudication hearing, the court dismissed count a-1 as to mother, sustained counts b-1, b-2, and b-3 as to mother, and sustained counts a-1, b-1, and b-4 as to father. The court ordered reunification services and twice weekly monitored visitation for both parents. Father's court-ordered case plan included a drug and alcohol program and testing, a domestic violence program, parenting classes, and individual counseling.

## IV.  Period of Review

Between April and September 2021, father failed to participate in court orders, did not submit to random drug testing, and failed to remain in contact with DCFS. In addition, father had not provided proof of participation in any programs. In May, he told the CSW that he was not going to participate in any part of his court-ordered case plan and began to raise his voice. The CSW ended the meeting and father had refused to meet with DCFS since then.

Father was visiting with the children once per week, when a monitor was available. He declined the option to have a second weekly visit, although PGM was approved as a monitor. DCFS did not have an HSA monitor available in July, but reminded father that he could use PGM as a monitor. Father did not respond and did not request visits for that month.

A. and R. continued to have monitored visits with father. The foster parent, Ms. R., reported that father would call the children at bedtime, rather than the scheduled time, and he was rude when he called. Father did not participate in services for the children, including CFT meetings and therapy.

In March 2022, DCFS reported that father had not remained in contact with the department and his whereabouts were unknown. Father continued to refuse to submit to any of the court-ordered drug tests, programs, or

4

classes. He participated in three visits with the children in October 2021, but had not contacted DCFS or the foster caregiver to request a visit since that time. The foster caregiver reported that father spoke to A. on the phone once per week for approximately 10 minutes. DCFS recommended terminating services.

In March 2022, father called the CSW and said he wanted to participate in visits. PGM had been visiting the children weekly, so the CSW suggested they visit together, as PGM was approved as a monitor. Father agreed. He still had not enrolled in any services or submitted to drug testing.

At the 12-month review hearing in March 2022, the court found that father had not made substantial progress with his case plan. The court terminated father's reunification services.

In June 2022, DCFS reported that father was not in regular contact with DCFS. The children were doing well with their foster caregiver. Father continued to speak with A. in one brief phone call per week. R. did not participate in these calls. Father also had nine in-person visits, monitored by PGM, between March and May 2022.

The court terminated mother's reunification services in October 2022 and set the matter for a permanency planning hearing.

## V.     Termination of Parental Rights

In its section 366.26 report in December 2022, DCFS stated that father's visits had been inconsistent and he had not established a relationship with the children. As of June 2023, DCFS reported that father's visits were still inconsistent and he was unable to engage the children during visits.

DCFS was having difficulty locating an adoptive family for the boys, largely due to R.'s behavioral issues. The boys remained in the foster home of Ms. R., but she was not able to provide a permanent home for them. The permanency planning hearing was continued several times in 2023 and 2024 to allow DCFS to continue to search for a permanent home for the boys.

Father participated in seven monitored visits from May to June, 2023. DCFS reported that the visits generally went well, but during a visit on May 18, the foster caregiver warned the HSA to watch R. carefully because father did not "do a good job in parenting." Another monitor reported that father

allowed R. to run in and out of stores at the mall grabbing items. Father did not take any action to keep R. safe, instead walking away during the child's behavioral outburst.

After June 28, DCFS did not have any monitors available. At the time of DCFS's report in July, a request for a new monitor was pending. Father continued to participate in brief weekly phone calls with the children. The children also continued to have weekly unmonitored visits with PGM.

Father had five monitored visits from early September to early November 2023. The HSA from one visit reported that father was engaged and patient with both children. Father had not visited the children since early November because no monitor was available. He continued his ten-minute weekly video calls with A. The foster caregiver told DCFS that since the children's visits with mother and father had been reduced, the children's behavior at home had improved.

At a February 2024 review hearing, the court ordered DCFS to ensure that a monitor was in place for at least weekly visits with father and mother. Father had four monitored visits from March to May, 2024. During these visits, R. continued to display behavioral issues such as defiance and tantrums. Father continued to have 10-minute weekly video calls with A.

Father had not contacted DCFS since May 23, 2024 to request a visit. DCFS reported that there was no HSA available to monitor visits during the month of June. DCFS noted that father did not request visits between July 30 and November 19, 2024.

A. and R. were placed in the potential adoptive home of Ms. D. and Ms. M. in October 2024, after having visits with them for three months. A. (now eight years old) told DCFS that he visited with both mother and father, but father more frequently. A. stated that during his visits with father, they would eat and play games. A. also stated that he wanted to live with Ms. D. and Ms. M.

At a hearing in November 2024, the court trailed the permanency planning hearing to allow the children time to adjust to their current placement. At father's counsel's request, the court ordered DCFS to provide father with a written visitation schedule within one week.

In January 2025, DCFS reported that it had not been able to secure a monitor for visits from mid-November 2024 to January 7, 2025. After that, father could resume weekly visits. The HSA monitored two visits with father in January 2025 at a McDonald's restaurant. Father sat at a table using his phone, while the children played. R. told the CSW that he did not like visiting father and did not want to visit him any longer. Ms. D. reported that both boys regressed in their behavior since father had increased contact with them. Specifically, R. exhibited more aggressive behaviors and A. had become more defiant. Both boys told DCFS that they wanted to stay with Ms. D. and Ms. M. and be adopted.

In its updated section 366.26 report in February 2025, DCFS reported that father had not visited consistently. Father did continue to have regular phone calls with A. In considering the extent of a beneficial relationship, DCFS noted that the children were detained when A. was four and R. was almost two, and had remained out of father's care since that time, almost four years. A. stated that he enjoyed his visits with father, but R. told DCFS that he did not want to have calls or visits with father. A CSW reported that father was sometimes rude to the caregiver and asked inappropriate questions, including asking A. questions regarding mother. When the CSW raised the matter with father, he started yelling and cursing at the CSW. Father's conduct affected the quality of the visits. Father also failed to follow the food restrictions for the children during visits. DCFS also reported that the children and prospective adoptive parents appeared to be very bonded to each other and the boys expressed their desire to be adopted by them.

At a hearing in February 2025, A. told the court that his new home with Ms. D. and Ms. M. was "great." A.'s counsel also told the court that "A. would like your honor to know that he misses his mom and dad very much, and he would want to live with his dad, if he can't with his mom. If he can't with [Ms. D. and Ms. M.], and he did want your honor to know that he feels safe with [Ms. D. and Ms. M.]. Everything is okay at home, but he misses his mom and dad very much." The children's counsel also shared the caregivers' concern that delaying the permanent plan would not help stabilize the children.

In a June 2025 report, Ms. D. and Ms. M. stated that the boys' behavior had stabilized. A. and R. said they were very happy and safe in their adoptive home and were excited to be adopted. Since the last court date on February 20, 2025, father had been visiting every week for two hours and also continued to have video calls with A. R. continued to attend the in-person visits, but told the CSW that he did so because it allowed him to play at McDonalds. A. and R. referred to their prospective adoptive parents as their moms and DCFS observed a strong parent-child bond with Ms. D. and Ms. M.

At the permanent plan hearing on July 3, 2025, counsel for DCFS and counsel for the children asked the court to terminate parental rights. Counsel for father argued that the parental benefit exception applied, as he had been regularly visiting the children and they were bonded to him.

The court found by clear and convincing evidence that A. and R. were adoptable. Turning to the parental benefit exception, the court found that father had not maintained regular visitation. The court noted that "the visitation that the parents have had has recently only begun, that for a very significant period of time in this case, the parents were not visiting with the children." The court found that father's behavior during visits often was not appropriate. The court also found that there "does not appear to be any significant bond with the parents" that would outweigh the benefits of permanency through adoption. Notably, the children "don't appear to have any strong significant emotional attachment to either parent" and that R. had been acting inappropriately afterward. As such, the court concluded there was no significant beneficial relationship between the children and father, such that terminating it would be detrimental to the children. Having concluded that no exceptions applied, the court terminated father's and mother's parental rights.

Father timely appealed from the court's July 3, 2025 orders.

## DISCUSSION

Father initially appealed as to both A. and R., but in his opening brief, he asserted error only as to the termination of his parental rights over A. Father did not file a reply brief. He has therefore failed to demonstrate error as to R. (See, e.g., *Aptos Council v. County of Santa Cruz* (2017) 10 Cal.App.5th 266, 296, fn. 7 ["Issues not raised in the appellant's opening brief

8

are deemed waived or abandoned."])  Regarding A., father contends that he met the requirements of the parental benefit exception.  We find no error.

## I.     Legal Principles
### A.     Parental benefit exception

The express purpose of section 366.26 is "to provide stable, permanent homes" for dependent children.  (§ 366.26, subd. (b).)  After reunification services are terminated, adoption is the legislative preference. (§ 366.26, subd. (b)(1); see also *In re Celine R.* (2003) 31 Cal.4th 45, 53 ["'Adoption is the Legislature's first choice because it gives the child the best chance at [a full] emotional commitment from a responsible caretaker.'"])  Thus, once the juvenile court finds the child is adoptable, "the court must order adoption and its necessary consequence, termination of parental rights," unless a parent can establish one of the exceptions set forth in section 366.26, subdivision (c). (*In re Celine R., supra*, 31 Cal.4th at p. 53; see also § 366.26, subd. (c)(1); *In re Caden C.* (2021) 11 Cal.5th 614, 625 (*Caden C.*).)  These statutory exceptions "merely permit the court, in exceptional circumstances, to choose an option other than the norm, which remains adoption."  (*In re Celine R., supra*, 31 Cal.4th at p. 53; see also *In re A.L.* (2022) 73 Cal.App.5th 1131, 1150.)

Father sought to apply the parental benefit exception, which permits the selection of another permanent plan if a parent has "maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."  (§ 366.26, subd. (c)(1)(B)(i).)  In *Caden C., supra*, 11 Cal.5th at p. 631, our Supreme Court set forth three elements the parent must prove to establish the parental benefit exception.

First, the parent asserting the exception must show "regular visitation and contact with the child, taking into account the extent of visitation permitted." (*Caden C., supra*, 11 Cal.5th at p. 636.) This element is "straightforward," involving an assessment of whether the parent visits consistently.  (*Id*. at p. 632.)

Second, the parent must show that "the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship." (*Caden C., supra*, 11 Cal.5th at p. 636.)  In assessing whether the child would

benefit from continuing the relationship with the parent, "the focus is the child.  And the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.'" (*Id*. at p. 632.)  Thus, "courts often consider how children feel about, interact with, look to, or talk about their parents." (*Ibid*.)

Third, the parent must show that terminating the parent-child attachment "would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*Caden C., supra*, 11 Cal.5th at p. 636.)  "Because terminating parental rights eliminates any legal basis for the parent or child to maintain the relationship, courts must assume that terminating parental rights terminates the relationship.  [Citations.] What courts need to determine therefore, is how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Id*. at p. 633.)  This evaluation consists of a "subtle, case-specific inquiry[,]" including consideration of whether "the benefit of placement in a new, adoptive home" outweighs the harm the child "would experience from the loss of [a] significant, positive, emotional relationship" with the parent. (*Ibid*.)  In making this detriment determination, the juvenile court does "not look to whether the parent can provide a home for the child," and "is not comparing the parent's attributes as custodial caregiver relative to those of any potential adoptive parent(s)." (*Id*. at p. 634.)

### B.     Standard of review

We apply a mixed standard of review to a juvenile court's findings regarding the parental-benefit exception.  The first two elements—regular visitation and a beneficial relationship—involve determinations that are essentially factual; we therefore review those findings for substantial evidence. (*Caden C., supra*, 11 Cal.5th at p. 640.)  The third element requires the juvenile court to determine whether any harm the child would suffer from the severance of the parental bond would outweigh the benefit to the child of adoption. (*Ibid*.)  Like the first two elements, the juvenile court must make a series of factual determinations including determinations about the child's

relationship with a parent, which we review for substantial evidence. (*Id*. at p. 640.) However, "the ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with his [or her] parent—is discretionary and properly reviewed for abuse of discretion." (*Ibid*.)

However, unlike in *Caden C.*, the juvenile court here found that father did not meet his burden of proving the exception. In such a case, where the trier of fact has "expressly or implicitly concluded that the party with the burden of proof did not carry the burden and that party appeals, it is misleading to characterize the failure-of-proof issue as whether substantial evidence supports the judgment. This follows because such a characterization is conceptually one that allows an attack on (1) the evidence supporting the party who had no burden of proof, and (2) the trier of fact's unassailable conclusion that the party with the burden did not prove one or more elements of the case." (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528, overruled on other grounds by *Conservatorship of O.B.* (2020) 9 Cal.5th 989.) Thus, to the extent father challenges the juvenile court's findings regarding his failure of proof, we determine whether the evidence compels a finding in father's favor as a matter of law, asking whether that evidence was uncontradicted and unimpeached and of such a character and weight as to leave no room for a judicial determination it was insufficient to support a finding. (*In re I.W., supra*, 180 Cal.App.4th at p. 1528.)

## II.  Analysis

The juvenile court found that father did not establish any of the three elements *under Caden C*. for the parental benefit exception. We find no error in that conclusion.

For the first element, the court found that father failed to consistently visit A. Father contends that any inconsistency in his visitation was due to DCFS's issues securing HSA monitors. While there were several periods during which DCFS was unable to provide a monitor for father's visits, the record does not support father's assertion that he visited the children to the extent he was permitted. Although father was allowed two visits per week, he never visited A. and R. more than once a week. He also declined DCFS's offer to have PGM monitor some of his visits, despite living with PGM for

11

several years and attending some visits together. Indeed, during several periods over the four years of visitation, PGM maintained weekly visits with more regularity than father did. For months at a time, father ignored attempts by DCFS to contact him, refused to meet with the CSWs or involve himself in the team meetings supporting the children, and made no request for visitation. Notably, father ignores this evidence and focuses only on the times when he was visiting more consistently or when no monitor was available. In addition, father did not raise any issues with visitation during any of the many juvenile court hearings, except for his counsel's request in November 2024 for a written schedule. Under these circumstances, the record does not compel a finding in father's favor that he maintained regular visitation with A.

The second element required father to establish that A. had a "substantial, positive, [and] emotional attachment" to him. (*Caden C., supra*, 11 Cal.5th at p. 636.) That meant demonstrating that the child's attachment was "significant" and conferred more than "some incidental benefit" to A. (*In re Autumn H*. (1994) 27 Cal.App.4th 567, 575.) Father argues that the evidence does not support the court's finding that there was no substantial attachment between him and A. But he cannot show, as he must, that the evidence was "uncontradicted and unimpeached and of such a character and weight as to leave no room for a judicial determination it was insufficient to support a finding." (*In re I.W., supra*, 180 Cal.App.4th at p. 1528.) Father had not cared for A. for more than half of A.'s life, and never progressed to unmonitored visitation, despite having more than four years of visitation to do so. In fact, he showed no engagement in his case plan apart from the visitation and no indication that he would ever progress past monitored visitation. He was inconsistent in visiting the children, and the monitors noted that during some visits father was unable to control R. and was rude to the HSA and the foster caregiver. Although A. stated that he enjoyed playing and eating with father during their visits and wanted the visits to continue, both boys expressed their strong desire to be adopted by Ms. D. and Ms. M. Thus, father has not shown that the evidence compelled a finding that he had the strong bond with A. required to apply the parental benefit exception.

We also find no error in the juvenile court's conclusion as to the third element, i.e. that father did not establish that terminating his relationship with A. would outweigh the benefits of adoption. Despite the years of difficulty in finding a successful match for adoption, A. and R. had developed a deep bond with Ms. D. and Ms. M., calling them "mom" and expressing that they felt loved and safe in their care. By the time of the July 2025 hearing, A. was almost nine years old and he expressed to DCFS his desire to stay with his caregivers and his excitement at being adopted by them. Although the children had some difficulties adjusting to a new placement, their behavior had stabilized and the caregivers were devoted to providing a permanent home for both boys and ensuring their needs were met. The importance of stability and permanency to be gained from adoption is particularly strong here, where the children endured several unsuccessful potential adoptive matches and waited years to find adoptive parents who could support the needs of both A. and R.

It is notable that father challenges the termination of his parental rights only as to A. The evidence shows that father and R. had a limited relationship, as the child expressed a desire not to attend visitation (or did so only to play at the restaurant) and refused to participate in phone calls with father. Father does not address how it would affect A. for father to maintain a relationship with A. but not with R., when the boys were strongly bonded to each other. Moreover, the court could consider that although A. expressed that he missed father and enjoyed their visits, there was no evidence that A. looked to father for comfort or guidance, or that he experienced any distress or anxiety when visits ended or in the periods when father did not visit. To the contrary, the caregivers reported worsening behavior by both children when visits with father increased. The court could also consider the length of time father was provided reunification services and his failure to complete them, and his failure to progress beyond monitored visitation for over four years. As such, the court was well within its discretion to conclude that the benefits of allowing the boys' adoption by their loving caregivers to whom they were bonded outweighed any detriment from terminating father's parental rights.

## DISPOSITION

The order terminating father's parental rights over A. and R. is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, J.


We concur:


ZUKIN, P. J.


TAMZARIAN, J.